IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| JUAN ORIHUELA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 19-00639-CV-W-BP |
| | ) | |
| CTB, INC., | ) | |
| d/b/a BROCK GRAIN AND FEED | ) | |
| SYSTEMS INC., | ) | |
| | ) | |
| Defendant. | ) | |

**ORDER AND OPINION GRANTING IN PART AND DENYING IN PART
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Plaintiff's suit asserts claims under the Missouri Human Rights Act, ("the MHRA"). Defendant has filed a Motion for Summary Judgment. For the following reasons, the motion, (Doc. 34), is **GRANTED IN PART** and **DENIED IN PART**.

**I. BACKGROUND**

The Record reveals the following undisputed facts (or, where disputed, facts viewed in the light most favorable to Plaintiff). Citations will be provided only as necessary.[1]

Defendant is in the business of manufacturing grain storage, handling, and conditioning systems. At all relevant times, except as discussed below, Plaintiff was employed by Defendant to operate a "floor support machine." A floor support machine is part of the production line on the Plant floor and is involved in the process of fitting metal parts together.

---

[1] The Court's consideration of the Record has been complicated by the manner in which the parties have responded to each other's proposed undisputed facts. Often, the parties (particularly Plaintiff) have created the illusion of factual disputes by offering responses that do not dispute the facts presented. Instead, many responses (1) dispute facts that were not contained in the other party's statement or (2) proffer additional facts that may or may not be relevant to the fact originally presented, but that nonetheless do not dispute it. In some instances, a party has disputed a fact that he or it later presented as undisputed. The Court will not provide citations to facts that the parties have claimed are disputed unless the response actually disputes the proffered fact. The Court also will not address facts that are not necessary to the resolution of the issues.

In January 2016, Brent Clark was hired as Plant Manager. In June 2016, Plaintiff injured his Achilles tendon and had to be off work. He was released to work with restrictions on July 6, 2016,[2] but those restrictions precluded him from operating a floor support machine or performing other work on the Plant floor so he was assigned a light duty job in the office. There had been opportunities for Plaintiff to work overtime when he was operating a floor support machine, but there was no need for overtime work in the office so he was not presented any overtime opportunities while he was on light duty. Plaintiff's work restrictions were removed on July 28, 2016, at which time he returned to operating a floor support machine and was again presented with opportunities to work overtime. In the meantime, Plaintiff complained to Clark that he was being denied opportunities to work overtime. He believed that other employees with the same restrictions were given overtime opportunities, and identified three such employees: Terrence O'Bryant, Tony Johnson, and Bill Hayes. O'Bryant, Johnson, and Hayes, are African American; Plaintiff is Hispanic and his nation of origin is Mexico. However, unlike Plaintiff, O'Bryant, Johnson, and Hayes were not limited to light duty and their work restrictions allowed them to perform jobs on the Plant floor.

In early 2017, Defendant hired Joachim Koeger as the Plant Superintendent, and he became Plaintiff's direct supervisor. On March 1, 2017 it was discovered that the machine Plaintiff operated had produced approximately 13,000 defective parts. The problem began while the machine was operated by Sanpio Cortez on the shift prior to Plaintiff's and continued through part of Plaintiff's shift. Machine operators are supposed to conduct periodic checks for errors, but Cortez did not check for errors. Plaintiff did not check at first either – despite knowing that he was supposed to – but he caught the error two hours into his shift. (Doc. 35-7, pp. 10-12 (Plaintiff's

---

[2] The parties' submissions contain a typographical error, indicating that Plaintiff was off work until July 6, 2019.

2

Dep., pp. 44-49).)[3]  The Record does not reflect how many of the defective parts were produced while Cortez was working and how many were produced while Plaintiff was working.

Plaintiff reported his discovery to Clark, who instructed that the line be stopped.  The defective parts, worth $50,000, had to be scrapped.  The Record establishes that this was not the only occasion on which defective products had been produced; however, the Record establishes this was one of the most, if not the most, egregious instances.  (*E.g.*, Doc. 35-2, p. 80 (Clark Dep., p. 80); Doc. 35-3, p. 12 (Gee Dep., p. 48).)  Other instances involved fewer parts, and some instances involved parts that could be reworked.  For instance, John Rice was responsible for producing defective parts, but the defective parts he was responsible for could be reworked and did not have to be scrapped.  (Doc. 35-2, p. 10 (Clark Dep., pp. 81-83).)

Plaintiff and Cortez were suspended for three days; the parties agree this decision was made by Koeger.  The written notice of the suspension (dated March 22, 2017) refers to Plaintiff's statements acknowledging that he knew he was supposed to conduct periodic checks.  The notice also cites Plant Rule 27, which prohibits "[f]ailure to follow job instructions, verbal or written" and Plant Rule 28, which prohibits "[c]ausing scrap of materials or parts due to carelessness."  The written notice further explains that "[o]rdinarily, misconduct of this magnitude warrants immediate discharge" but "due to mitigating circumstances that include the potential that the [Defendant's] work instructions and system of quality checks could have been more clearly defined" Plaintiff would receive "a lesser disciplinary penalty of a 3 day suspension."  (Doc. 35-7, p. 48.)  Plaintiff did not file a grievance over this discipline; the Record does not reflect if Cortez did.[4]  Later, Clark

---

[3] Unless otherwise indicated, all page numbers are those generated by the Court's CM/ECF system.

[4] United Steelworkers International Union Local 13-05 represented certain employees at the Plant, including Plaintiff.

3

and Koeger were "verbally coached" regarding the lack of clarity in the instructions regarding quality checks. (Doc. 36-2, p. 12 (Gee Dep., pp. 46-48).)

Meanwhile, later on March 1, after reporting the problem to Clark and after the line was shut down, Plaintiff was talking to Bill Hayes to tell him what was happening and to advise that the defective parts should not be shipped. Clark approached Plaintiff, grabbed him, cursed at him, and told him to get back to work. This violated, at a minimum, Plant Disciplinary Action Guideline No. 12, which prohibits acts that "[t]hreaten, intimidate or interfere with a fellow employee." Plaintiff does not dispute that at the time of this incident Clark was not aware Plaintiff had made any complaint of any kind suggesting that he had been subject to discrimination. (Doc. 36, p. 28 (Plaintiff's response to Defendant's Undisputed Fact No. 71).) Indeed, there is nothing in the Record indicating that Plaintiff made any complaints of discrimination on or before March 1, 2017; in particular, Plaintiff does not contend (and there is no evidence suggesting) that Plaintiff's complaints regarding overtime opportunities in July 2016 asserted that the decision was discriminatory. On March 2, 2017, Plaintiff submitted a grievance complaining of Clark's conduct, and Clark was given a verbal warning.

On March 17, 2017, Plaintiff filed a Discrimination Complaint, ("the First Charge"), with the Kansas City Human Relations Department. (Doc. 35-7, p. 43.) He checked a box indicating that he was complaining about retaliation and discrimination based on national origin but did not check a box indicating that he was discriminated against based on race. The First Charge's narrative discusses two incidents. In the first, Plaintiff alleges that he was subjected to discrimination when he "was not allowed to work overtime because of my injury restriction. I believe I am being discriminated against because . . . my African American union brothers were/are allowed to work in other positions for overtime with restrictions." The description of the second

4

incident states: "Brent Clark physically and verbally assaulted me in the presence of Bill Hayes. I believe Mr. Clark is retaliating against me because I complained about discriminatory treatment."

On April 3, 2017, Plaintiff submitted another grievance, alleging that Clark discriminated against him on March 29 when Plaintiff was "preparing for [a] break" with some African American co-workers, and Clark approached Plaintiff "aggressively" and told "only" him to run his machine. (Doc. 35-7, p. 49.)  In his deposition, Plaintiff described the incident differently.  He testified that Clark was talking to the other employees and he (Plaintiff) was not part of the conversation.  Clark saw Plaintiff walking from shipping and stopped his conversation with the other employees to ask Plaintiff what he was doing.  Plaintiff explained that he was getting a document from Koeger; Clark observed that it was not break time and Plaintiff needed to "go back to [his] machine and start running it."  (Doc. 35-7, pp. 21-22 (Plaintiff's Dep., pp. 87-89).)

On June 30, 2017, Plaintiff was given a written warning for being on his cellphone while operating a forklift a little more than a week before.  There is a factual dispute as to whether Plaintiff was on a break when he was on the cellphone.  Plaintiff submitted a grievance for this discipline, (Doc. 36-16), but the Record does not reflect the outcome of the grievance.

Plaintiff submitted another grievance to Defendant late June or early July.  This grievance alleges Plaintiff was subjected to discrimination, harassment and retaliation when Clark or Koeger reminded Plaintiff to wear his personal protection gear at all times based on a report that he had not been wearing it; Plaintiff contended that the report was false so he should not have been reminded to wear his personal protection gear. (Doc. 35-7, pp. 52-53.)

Plaintiff submitted yet another grievance on July 12, 2017, complaining that Clark was retaliating against him for submitting grievances.  His grievance alleges that Clark told a temporary supervisor to tell Plaintiff to go to his line after the morning bell signaling the start of the shift

5

rang, but not to advise the other employees Plaintiff was talking to at the time. (Doc. 35-7, pp. 54-55.)

Plaintiff's job responsibilities included recording his production for the day. In August 2017, Koeger spoke with Plaintiff about his failure to record his production, which caused Defendant's inventory count to be off. He was not disciplined, but the importance of completing the records was stressed, and Koeger warned Plaintiff that further failures to follow plant rules would lead to his termination.[5]

The incident that led to Plaintiff's termination occurred on August 17, 2017. Defendant contracts with a third party, Standard Tool, to provide on-site electricians in case electrical work (including electrical repairs) is needed. Safety Rule 7 provides that employees are not to "operate, adjust, reconfigure or set in motion any machine or equipment unless authorized to do so," and Safety Rule 10 provides that "[a]ll electrical equipment, wires, motors, fixtures and cords shall be treated as live. Only authorized and approved maintenance technicians are to repair, replace, adjust or reconfigure electrical equipment." However, there were occasions when an electrician was on call and not on-site when needed, and on some occasions the necessary "repair" involved entering an electrical panel and resetting a switch. On August 17, 2017, Plaintiff went into the electrical panel to reset a switch. Koeger saw Plaintiff in the electrical panel and asked what he was doing; Plaintiff said that he was resetting a switch. Plaintiff was suspended without pay pending an investigation, and on September 1 he was terminated.

There is evidence in the Record that workers reset electrical switches to avoid taking the line down when there was no electrician on-site. There is evidence in the Record that this practice

---

[5] Plaintiff attempts to dispute this fact by contending that it was acceptable to turn in the reports the following day. However, in his testimony he does not seem to deny that he was more than one day late on occasion. Moreover, his testimony establishes that he frequently turned in reports the following day, but his testimony does not establish that it was acceptable for him to do so. (*See* Doc. 35-7, pp. 28-29 (Plaintiff's Dep., pp. 115-17).)

predated both Clark's and Koeger's tenure with the company. There is also evidence in the Record that both Clark and Koeger were aware that employees reset electrical switches. (*E.g.*, Doc. 36-25, ¶ 13; Doc. 36-26, ¶ 19; Doc. 36-27, ¶ 20.)[6] There is no evidence in the Record that anyone else has been disciplined for resetting electrical switches. The Record does not reflect whether Plaintiff filed a grievance over the suspension and termination.

Plaintiff filed another Discrimination Complaint with the Kansas City Human Relations Department ("the Second Charge") on January 8, 2018. Plaintiff marked a box indicating that he was complaining about "retaliation." The narrative states:

> On August 8, 2017 I was suspended for getting inside an electrical box to keep my machine operating. This was a common practice among similarly situated employees at the direction of every supervisor I worked under over three years. On September 1, 2017 I was terminated. I believe I was retaliated against because I complained about discriminatory treatment.

(Doc. 35-7, p. 45.)

Plaintiff initiated this suit in state court; it was later removed to federal court. The Complaint[7] contains factual allegations about: (1) the denial of overtime hours while Plaintiff was restricted to light duty, (Doc. 1-1, pp. 7-8, ¶¶ 10-16); (2) the incident involving the production of defective parts (including Plaintiff's suspension and Clark's actions), (Doc. 1-1, p. 8, ¶¶ 18-23); (3) Plaintiff's suspension and termination for resetting the electrical switch, (Doc. 1-1, pp. 9-10, ¶¶ 29-35); and (4) general allegations that Plaintiff's work was "heavily scrutinized," (Doc. 1-1, pp. 8, 9, ¶¶ 17, 28.) After setting forth these allegations, the Complaint asserts two counts under the MHRA. Count I is entitled "Discrimination and Harassment based upon Race and National Origin" but does not specify which facts relate to which theories. Count II alleges that Plaintiff

---

[6] Defendant filed a Motion to Strike that, among other things, asked the Court to strike these statements, (Doc. 40). As discussed more fully in Part II(C)(2) below, the Court does not agree that these statements should be struck.

[7] Now that the case is in federal court, federal nomenclature will be used.

7

was subjected to retaliation when he was suspended and terminated for resetting the electrical switch.

Defendant seeks summary judgment on all claims; Plaintiff opposes summary judgment. As discussed below, Defendant's motion is **GRANTED IN PART** and **DENIED IN PART**.

## II.  DISCUSSION

A moving party is entitled to summary judgment on a claim only upon a showing that "there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." *See generally Williams v. City of St. Louis*, 783 F.2d 114, 115 (8th Cir. 1986). "[W]hile the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 993 (8th Cir. 2011) (quotation omitted).  In applying this standard, the Court must view the evidence in the light most favorable to the non-moving party, giving that party the benefit of all inferences that may be reasonably drawn from the evidence. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Tyler v. Harper*, 744 F.2d 653, 655 (8th Cir. 1984), *cert. denied*, 470 U.S. 1057 (1985). A party opposing a motion for summary judgment may not simply deny the allegations but must point to evidence in the Record demonstrating the existence of a factual dispute.  Fed. R. Civ. P. 56(c)(1); *Conseco Life Ins. Co. v. Williams*, 620 F.3d 902, 909-10 (8th Cir. 2010).

The Court notes significant inconsistency between (1) the claims and facts asserted in the First and Second Charges, (2) the claims and facts asserted in the Complaint, and (3) the claims and facts discussed in the summary judgment briefing.  The Complaint can be interpreted as

8

Case 4:19-cv-00639-BP   Document 44   Filed 03/25/21   Page 8 of 15

advancing claims and facts that are not present in the charges, and the summary judgment briefing discusses claims and facts that appear in neither the charges nor the Complaint. All these claims require timely administrative exhaustion, which is an issue prominently raised by Defendant in support of summary judgment. Therefore, in the unique circumstances of this case, the Court deems it appropriate to first address the issue of exhaustion and then address the merits of any properly exhausted claims. As a result, the Court's discussion will not follow the Complaint's organization, but in this way the Court will address all the claims that have been alluded to by the parties.

### A. Failure to Exhaust

In order to assert an MHRA claim, an administrative charge must first be filed with the Missouri Human Rights Commission or an appropriate "local commission," such as the Kansas City Human Rights Commission, within 180 days of the discriminatory act. MO. REV. STAT. §§ 213.075.1, 213.075.2. Numerous claims asserted (at least arguably) in the Complaint or implicitly raised in the Summary Judgment briefing were not presented in either the First Charge or the Second Charge. These claims include:

- Plaintiff's race and national origin were contributing factors to his March 2017 suspension,
- Plaintiff's race and national origin were contributing factors to Defendant's decision not to terminate Clark for grabbing and cursing at him in March 2017,
- Clark's race and national origin were contributing factors to Defendant's decision not to terminate Clark for grabbing and cursing at Plaintiff in March 2017,
- Plaintiff's race and national origin were contributing factors to Clark grabbing and cursing at him in March 2017,[8]

---

[8] The First Charge mentions Clark's actions in March 2017 but clearly presents it as a claim of retaliation for prior protected conduct and not a claim of discrimination. The Complaint arguably presents it as a claim of discrimination,

9

- Plaintiff was subject to increased scrutiny that constituted actionable harassment, and
- The actions described in Plaintiff's grievances filed between April and July in 2017 constitute harassment.

Plaintiff does not address his failure to exhaust these claims. He discusses the topic of exhaustion in another context, arguing that his failure to mark the box for "race" on the First Charge does not preclude him from asserting that he was denied overtime in July 2016 based on his race because an investigation of the First Charge could be reasonably expected to address that claim. (Doc. 36, pp. 73-75.) And, Plaintiff's argument is viable in that context because the body of the First Charge discusses the denial of overtime opportunities and compares Plaintiff's treatment to that of his "African American union brothers." But he does not apply the argument to the claims listed above, and the Court does not believe Plaintiff's argument would apply to them even if he had made it. "[A]dministrative remedies are deemed exhausted as to all incidents of discrimination that are likely or reasonably related to the allegations of the administrative charge. Further, the scope of the civil suit may be as broad as the scope of the administrative investigation which could reasonably be expected to grow out of the charge of discrimination." *Farrow v. Saint Francis Med. Ctr.*, 407 S.W.3d 579, 594 (Mo. 2013) (en banc). However, new claims dependent on previously-unasserted facts are not reasonably related to the claims contained in the administrative charge. *E.g., id.* (administrative claim "contained no allegations whatsoever that would put [the defendant] on notice that she intended to raise additional claims regarding retaliation"); *Reed v. McDonald's Corp.*, 363 S.W.3d 134, 143-44 (Mo. Ct. App. 2012) (constructive discharge claim was not reasonably related to the claims contained in the

---

although that is not clear. Plaintiff's response to the Motion for Summary Judgment discusses the theory that *Clark*'s race and national origin was a factor in Defendant's decision not to terminate Clark. (Doc. 36, pp. 79-80.)

administrative charge, where the charge did not mention the plaintiff no longer worked for the employer).

Here, Plaintiff not only did not assert these claims, he did not present the underlying facts for many of them. For instance, neither Charge mentions his March 2017 suspension, the fact that Clark was not terminated, Plaintiff's grievances, or the allegedly increased scrutiny directed at Plaintiff. Therefore, these claims (and any others not discussed elsewhere in this Order) were not reasonably related to the claims and facts presented in either Charge and Defendant is entitled to summary judgment on them.[9]

### B. Timeliness of the Charge

As stated earlier, a prerequisite for asserting an MHRA claim is exhaustion of the claim by filing an administrative charge within 180 days of the discriminatory act. Plaintiff filed the First Charge on March 17, 2017, making it timely with respect to all events occurring on or after September 18, 2016. However, while the First Charge discusses the denial of overtime opportunities, that denial ended in July 2016, making the First Charge untimely as to that claim.

Plaintiff contends that the First Charge is nonetheless timely with respect to the denial of overtime opportunities in July 2016 because he has alleged that a continuing violation existed. The Court disagrees. Under Missouri law, a plaintiff can seek recovery for acts that occur more than 180 days before the administrative charge is filed if those acts are part of a continuing

---

[9] The Court further observes that Defendant would be entitled to summary judgment on the merits of most if not all these claims. For instance, there is no evidence that Plaintiff's race or national origin contributed to Plaintiff's suspension for his part in producing defective parts. Plaintiff's reference to other employees who were involved in producing defective parts does not help his claim given that the Record establishes the incident involving Plaintiff and Cortez was more serious than the other employees' transgressions (in that it involved more parts and cost Defendant substantially more money than any other such incident). There is no evidence that Plaintiff's or Clark's race or national origin played a part in Defendant's decision not to terminate Clark or in Clark's decision to grab and curse at him; moreover, Defendant's "failure" to terminate Clark did not affect the terms or conditions of *Plaintiff's* employment or otherwise cause him damage. And there is no evidence that would permit a jury to find that Plaintiff was subjected to actionable harassment; the conduct he experienced was not sufficiently intimidating, hostile or offensive. *See, e.g., M.W. v. Six Flags St. Louis, LLC*, 605 S.W.3d 400, 410-11 (Mo. Ct. App. 2020) (stating standard).

11

violation. *Wallingsford v. City of Maplewood*, 287 S.W.3d 682, 685 (Mo. 2009) (en banc). "A plaintiff must establish two things to take advantage of the continuing violation theory. First, [he] must demonstrate that at least one act occurred within the filing period. Further, [he] must establish that the [discrimination] is a series of interrelated events, rather than isolated or sporadic acts of intentional discrimination." *Pollock v. Wetterau Food Distribution Grp.,* 11 S.W.3d 754, 763 (Mo. Ct. App. 1999) (citations omitted); *see also Tisch v. DST Sys., Inc.,* 368 S.W.3d 245, 252 (Mo. Ct. App. 2012). However, Missouri courts have held that decisions such as termination, failure to hire or promote, and denial of transfers are discrete acts that do not constitute a continuing violation. *Tisch,* 368 S.W.3d at 254-55; *see also Rowe v. Hussmann Corp.,* 381 F.3d 775, 782 (8th Cir. 2004) (observing that for a continuing violation to exist under Missouri law "the component acts must be sufficiently related to form a single practice, at least part of which continued into the limitations period." (quotation omitted)).

Here, the denial of Plaintiff's overtime opportunities ended in July 2016, and there is nothing to connect that discrete employment decision with the "next" actionable incident Plaintiff alleges in March 2017. Plaintiff attempts to create a continuing violation by relying on general declarations from three co-workers (Mike Wagner, Richard Ray, and Salvador Riojas) averring that "[u]nfair discriminatory practices" have occurred and their reports about discrete events that involved other employees (where the declarant's basis for personal knowledge is often unestablished and questionable). (*E.g.*, Doc. 36-25, ¶¶ 16-21; Doc. 36-26, ¶¶ 33-38; Doc. 36-27, ¶ 8.) These general descriptions of "discrimination" are not competent evidence that discrimination occurred, or that it occurred with sufficient frequency to establish a continuing violation. Similarly, a series of unrelated discrete acts spread out over unspecified time periods does not create an overarching continuing violation encompassing all of them. More importantly,

12

the question is whether *Plaintiff* experienced a continuing violation of the MHRA; Plaintiff has not contended that he did and there is no evidence that he did.[10]

The denial of overtime opportunities ended in July 2016, and more than 180 days passed before Plaintiff filed the First Charge in March 2017. Thus, the First Charge was not timely with respect Plaintiff's claim that he was denied overtime based on his race or national origin and Defendant is entitled to summary judgment on that claim.[11]

### C. The Merits of the Remaining Claims

This leaves two claims that were timely raised in an administrative charge: (1) Plaintiff's claim that Clark grabbed him in March 2017 in retaliation for Plaintiff's complaints of discrimination, and (2) Plaintiff's claim that he was suspended and terminated in August 2017 in retaliation for his complaints of discrimination.

#### *1. Retaliation Based on Clark's Actions on March 1, 2017*

Defendant contends that it is entitled to summary judgment on Plaintiff's retaliation claim based on Clark's actions on March 1, 2017 because Plaintiff had not engaged in protected activity

---

[10] Plaintiff also relies on Exhibit 23, (Doc. 36-23), which he describes as "K.C. Human Relations Investigation Statements." (*E.g.*, Doc. 36, p. 9 (Plaintiff's response to Defendant's Uncontroverted Fact 7).) Defendant has filed a Motion to Strike regarding Exhibit 23, and the Court agrees that it cannot consider Exhibit 23. Exhibit 23 is a series of four unsigned (and unsworn) letters or statements, and there is no indication who wrote them or (other than Plaintiff's representation that they are an investigator's notes of interviews) what they are. They purport to report statements made by Wagner, Ray, Riojas, and another co-worker (Kennth Buford). Exhibit 23 is not only hearsay, but its contents are also hearsay; even if the Court accepts that the author of Exhibit 23 would be available or willing to testify consistently with Exhibit 23's contents, Plaintiff does not explain how the second layer of hearsay can be avoided. Regardless, for the reasons discussed above, Exhibit 23 is not competent evidence that a continuing violation existed, much less that Plaintiff was subjected to a continuing violation that makes the First Charge timely with respect to claims involving the denial of overtime.

[11] Even if the claim had been timely presented, Defendant would still be entitled to summary judgment because the undisputed facts demonstrate that (1) unlike Plaintiff, O'Bryant, Johnson and Hayes were still able to perform jobs on the Plant floor where overtime opportunities were present, (2) the only work Plaintiff could perform was in the office, (3) there was no need for office workers to work overtime and hence no overtime opportunities existed, and (4) as soon as Plaintiff's medical restrictions were cleared, Plaintiff returned to his job on the Plant floor and was again offered overtime opportunities. And, Plaintiff does not explain how any facts in the Record demonstrate that his race or national origin contributed to the decision denying him overtime opportunities. (*See* Doc. 36, pp. 76-78.)

before that date. Plaintiff does not address this argument, and the Court agrees with Defendant that summary judgment is appropriate.

"To establish a prima facie case of retaliation under the MHRA, a plaintiff must prove that: (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *McCrainey v. Kansas City Missouri Sch. Dist.*, 337 S.W.3d 746, 753 (Mo. Ct. App. 2011). Here, the Record establishes that Plaintiff did not complain about discrimination before March 1, 2017; his first such Complaint was the First Charge, which was filed on March 17, 2017.[12] Therefore, accepting that on March 1 Clark grabbed Plaintiff's arm and cursed at him, these actions could not have been retaliation for any complaints of discrimination and Defendant is entitled to summary judgment.

### *2. Retaliation Based on Plaintiff's Suspension and Termination*

Defendant seeks summary judgment on Plaintiff's claim that his suspension and termination in August 2017 were retaliation for his complaint(s) of discrimination.[13] Its argument depends on its characterization of the Record as establishing that "there was no evidence that other employees had engaged in similar rule or safety violations but were not disciplined." (Doc. 35, p. 31; *see also* Doc. 39, p. 101.) And, if this characterization were correct, Defendant might be entitled to summary judgment.

But this characterization of the Record is not correct. Wagner, Ray, and Riojas all swear that both Clark and Koeger saw employees reset electrical switches. Defendant argues that these portions of their affidavits must be struck because they are not based on personal knowledge. (Doc.

---

[12] As noted earlier, Plaintiff did not characterize the denial of overtime in July 2016 as discriminatory until he filed the First Charge on March 17, 2017.

[13] It is not clear how many of Plaintiff's grievances were complaints about discrimination; many appear to be grievances related to Defendant's policies or general complaints that do not appear to complain about discrimination. There is no need to resolve this issue because there is no question that the First Charge constituted a complaint about discrimination.

14

41, p. 2.) And the Court agrees that some portions of their affidavits (such as those portions purporting to state what Clark and Koeger *knew*) are not based on personal knowledge. But Defendant does not explain why someone cannot observe an event, describe the proximity of other people to the event, and further explain what other people were in a position to see. To the contrary, the Court believes that such testimony may be admissible. And, when Plaintiff offered a similar explanation with respect to these aspects of the Affidavit, Defendant did not address the issue in its Reply Suggestions on the Motion to Strike.

The Court is unable to conclude that Wagner, Ray and Riojas cannot offer admissible testimony from which a jury could find that Clark and Koeger saw (and thereby create an inference they knew) that employees routinely reset electrical switches without suffering repercussions.[14] A jury could further find that Plaintiff suffered a repercussion while others did not because he filed the First Charge, and thus find for Plaintiff on his claim of retaliation. Therefore, Defendant is not entitled to summary judgment on Plaintiff's claim that he was suspended and terminated because he complained about discrimination.

### III. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment is denied with respect to Plaintiff's retaliation claim based on his August 2017 suspension and subsequent termination. The motion is granted in all other respects.

**IT IS SO ORDERED**.

/s/ Beth Phillips
BETH PHILLIPS, CHIEF JUDGE
DATE: March 25, 2021   UNITED STATES DISTRICT COURT

---

[14] This should not be construed as a ruling that they can so testify. This matter may not be resolvable until the Court hears their testimony at trial.